UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

QUINCY LEE            CIVIL ACTION NO. 08-cv-1075

VERSUS            JUDGE WALTER

WARDEN, LOUISIANA STATE            MAGISTRATE JUDGE HORNSBY
PENITENTIARY

**REPORT AND RECOMMENDATION**

**Introduction**

Quincy Lee ("Petitioner") was charged with aggravated burglary, but a Bossier Parish jury convicted him of the lesser crime of simple burglary of an inhabited dwelling. Petitioner was adjudicated as a third-felony habitual offender and received a natural-life sentence. His conviction and sentence were affirmed on direct appeal. State v. Lee, 909 So.2d 672 (La. App. 2d Cir. 2005), writ denied, 936 So.2d 195 (La. 2006). Petitioner's post-conviction application was also denied by the state courts. He now seeks federal habeas corpus relief on the grounds that: (1) the evidence was insufficient to support his conviction; (2) he was denied his right to self-representation; (3) he received ineffective assistance of trial counsel; and (4) a predicate offense used to obtain the habitual offender adjudication was invalid. For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

Louisiana defines simple burglary of an inhabited dwelling as "the unauthorized entry of any inhabited dwelling, house, apartment or other structure used in whole or in part as a

home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in [the aggravated burglary statute]."

The evidence showed that Lucy Jureski, her children, and her fiancee, Oscar Rodriguez lived in a home at 916 Wanda Street in Bossier City. Ms. Jureski, accompanied by her young niece, came home at about 2:00 p.m. on October 31, 2002, walked through the front door of her house, and discovered a lone, black male burglar. Ms. Jureski testified that she had never seen the man before in her life and told him to "get the hell out of my house." She picked up her niece and began to run out the front door when she felt something grab the back of her shirt and pull it against her neck as if someone was trying to keep her from getting out the door. The man let her go, and he ran out the back door. Ms. Jureski said she had a good look at the burglar, but she did not identify Petitioner in a pretrial photo lineup, and she admitted at trial that she could not then identify Petitioner as the burglar.

Ms. Jureski and Mr. Rodriguez both testified that they had thoroughly cleaned the house a few days earlier, even washing the walls, but they found it in disarray with items of electronics and other property either missing, disconnected, or found out of place or in the yard. There were scratches on the open back door, and the back gate was open.

David Clower, who worked at a nearby used car lot, testified that he saw a silver Taurus or Sable car being driven across a nearby vacant field at about 2:00 p.m. on the day of the burglary. Clower noticed that the trunk of the car was open, and there was a large object in the trunk. The driver of the car was black.

More than 30 fingerprints were taken from inside the home, but only some of them were of a quality that could be used. Three items in the home - a door to an entertainment center from which items were taken, a VCR, and a plastic jar containing money - had prints that were matched to Petitioner by searching the AFIS database.

Petitioner had prior convictions for simple burglary and simple robbery, and he was in prison from 1998 until released on September 30, 2002, about one month before the burglary. He was arrested, and Bossier City Detective Richard Nunnery interviewed him at the police department. Petitioner first told Nunnery he did not know where Wanda Street was, he was unfamiliar with Bossier City (though he knew Shreveport and Plain Dealing), and that he had been in Dallas with a friend, Mark Dunn, on the date of the crime.

Mark Dunn told police (and testified at trial) that he had been in Dallas with Petitioner October 24 through 28, but Dunn was back in Shreveport on the 31st (the day of the burglary) and working at his job. Detective Nunnery interviewed Petitioner again the next day and confronted him with this information. Petitioner then said he probably was not with Mark Dunn in Dallas. He was with someone else, but he could not tell the detective who that person was. Petitioner also said that he had never lived in Bossier City and did not have a car, before terminating the interview by asking for an attorney. Detective Nunnery performed research and found an indication that Petitioner had lived at the 916 Wanda Street address in Bossier City in 1995. Dunn also testified at trial that he had seen Petitioner driving a gray, silver, or white Taurus. He heard at some point, he was not sure when, that Petitioner had wrecked the car.

The defense called Ronnie Lee, Petitioner's uncle, who had signed an affidavit that admitted he committed the burglary at Wanda Street and claimed Petitioner knew nothing of it. Lee, who was then serving time and has several burglary convictions of his own, testified that he did not know anything about the Wanda Street burglary and had signed the affidavit only to help his nephew possibly avoid a life sentence.

Petitioner's 16-year-old brother, Jacoby Lee, testified that he, Petitioner, and a friend named Carrie were riding around on October 31 in a black Grand Am. Petitioner received a phone call and asked Carrie to take him to a house in Bossier City. Jacoby said he and Carrie waited in the car. They saw Petitioner knock on the door, and a black male let him in the house. Jacoby was uncertain whether the man was his uncle. Petitioner was inside for about 15 minutes, and he was not carrying anything when he left. Jacoby said this was about 5:00 or 6:00 in the evening and it was getting dark. (The burglary happened at about 2:00.) The first time Jacoby gave this statement was the day before he testified at trial. Jacoby testified that he had never been to the house before and did not know that his aunt once lived there, but when pressed he admitted he did know she had lived there.

Petitioner testified that he was riding around in the black Grand Am with Jacoby and Carrie when he received a phone call from his Uncle Ronnie, who said he needed to borrow some money because he had "like a little pertinent situation he needed." Ronnie told Petitioner to come by his "old aunt's house." Petitioner said he knew where the house was located on Wanda Street in Bossier City.

Petitioner testified that his uncle let him in the house and, after hugging him, went to get Petitioner some water. Petitioner said he had to move a VCR that was on the armrest of the couch. He wanted some music to listen to as he, Carrie and Jacoby rode around, so he went to the entertainment center to see what kind of CDs his uncle might have. Petitioner said he pushed aside the plastic bucket so he could place his water glass on the table. Petitioner left because he did not have "the sufficient funds what he wanted to borrow."

As for the failed alibi, Petitioner said that he knew he and Mark Dunn were in Dallas around Halloween because they went to a Halloween costume party, but he was not clear on the date. He thought it was October 31, but he acknowledged he had given a wrong date. Petitioner testified that he did not have a car but had once borrowed a friend's gray car for one trip, and Dunn saw him driving it so may have believed it belonged to Petitioner. He said he never lived with his aunt at 916 Wanda Street, but he had visited the house.

Petitioner testified on cross examination that he could not remember the time of day he visited the house on October 31. He was asked what he thought about the family pictures in the living room. Petitioner said that was the first thing he asked about, but his uncle told him the lady (with her children) in the pictures was his girlfriend. There was some debate between Petitioner and the prosecutor as to whether the pictures also depicted a male family member.

Petitioner's grandmother, Gertrude Lee, testified that she raised Petitioner at her home in Plain Dealing, which is in Bossier Parish but located several miles from Bossier City. She said that Petitioner never lived at 916 Wanda Street in Bossier City, which address was once

the home of Petitioner's mother's sister, but Petitioner "was familiar with the location because we used to go visit her a lot." Ms. Lee testified that they visited the sister at the Wanda Street house "about every week or something like that."

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable

facts. Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

The state appellate court reviewed the testimony and other evidence in great detail. It identified the elements of the crime and applied the Supreme Court's Jackson standard. It found that the evidence was actually sufficient to prove the greater crime of aggravated burglary (considering the battery upon Ms. Jureski), that the prosecution established Petitioner's identity as the burglar through testimony and physical evidence including fingerprints, and the jury obviously rejected Petitioner's rather preposterous explanation of how his fingerprints were found inside the home. State v. Lee, 909 So.2d at 677-78.

There is no doubt in this case that the state court's decision was neither contrary to nor an unreasonable application of Jackson to the facts in this case. The State had sound evidence, particularly the fingerprints, that Petitioner was the burglar. His testimony, undermined by his prior convictions, inconsistent prior statements, and inherent implausibility, did not have to be accepted by the jury, and it was not. The jury made its decision, the state appellate court reviewed it under the correct principles of law, and the state court reached a very reasonable decision that the verdict was supported by the evidence. Accordingly, habeas relief is not permitted on this claim.

**Self-Representation**

Petitioner was charged and referred to the Indigent Defender Board ("IDB") in November 2002. He made his first court appearance in January 2003, represented by attorney Mark Manno from the IDB. Petitioner made other appearances with Mr. Manno, as well as one with IDB Board attorney Angela Waltman, in the months that followed. According to correspondence obtained by Petitioner during the post-conviction proceedings, Manno left the IDB in December 2003, shortly before Petitioner's January 12, 2004 trial date. When Petitioner appeared for trial, he was represented by IDB attorneys Elizabeth Gardner (who began working at the IDB that month) and Larrion Hillman (who began working at the IDB the prior month). Ms. Gardener's appearance is noted, but the transcript indicates that Mr. Hillman handled the defense.

At the commencement of the proceedings, and before jury selection began, Petitioner said that he would "like to file this Motion for Self-Representation With Co-Counsel." Tr. 93C. The written motion was titled "Motion for Self-Representation." It cited Faretta v. California, 95 S.Ct. 2525 (1975), which recognized the right of self-representation at trial, asked that current counsel be dismissed because they were unprepared for trial, stated that Petitioner was ready to proceed, and represented that the motion was not a delay tactic. The motion requested, however, that the court also appoint standby counsel to assist "with basic courtroom mechanics." Petitioner asked that he be allowed to control the organization and content of his defense, make motions, argue points of law, question witnesses, and the like "at appropriate points in the trial." Tr. 39-40.

Petitioner tendered the motion to Judge Bruce Bolin, who noted that it was then more than two hours after the scheduled 9:30 a.m. time to begin selection of the jury. Petitioner said he had prepared the motion the night before but had not served it on the prosecutor. Judge Bolin found the motion was untimely and would be disruptive to the trial process given that it was already almost noon on the first day of trial. Petitioner complained that attorney Hillman "just took over my case like four days ago" and had not sat down and discussed it with Petitioner, who said, "I'm more prepared than he is on my case."

Attorney Hillman told the judge that he found out he was assigned to the case about two weeks earlier and immediately visited with Petitioner at the jail, which was the first of three visits, including one in which witnesses identified by Petitioner were brought in for a meeting. Hillman said he did not know anything else Petitioner wanted him to do to prepare for trial, and he was ready to proceed. Judge Bolin repeated that he would deny the motion, but he assured Petitioner he had the right to communicate with his counsel throughout the trial, have input, and make certain decisions, but Hillman would remain court-appointed counsel. Despite Petitioner stating in the motion that he was ready to proceed, it was mentioned in court that Petitioner would like a continuance to discuss with his uncle whether the uncle would testify. The judge said he would deny such a request. It was also noted of record that the State offered to resolve four pending felony charges with a plea bargain for a 25-year sentence, which would have avoided the potential for a life sentence. Petitioner rejected the offer, against the advice of counsel. Tr. 93C-N.

Petitioner raised the Faretta claim on direct appeal. The appellate court "decline[d] to second-guess the trial court in its ruling about this eleventh hour request" made on the morning of trial. Despite Petitioner's representation to the contrary, the appellate court found that the "circumstances indicate that his request was merely a delaying tactic." The court observed that the right to self-representation must be asserted in a timely manner, citing Martinez v. Court of Appeal of California, 120 S.Ct. 684 (2000), and found that Petitioner's request was "anything but timely." State v. Lee, 909 So.2d at 680-81.

The issue on habeas review is whether the state court's decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). The Supreme Court stated in Martinez that the right to self-representation is not absolute because the defendant must voluntarily and intelligently elect to conduct his own defense, "and most courts require him to do so in a timely manner." Martinez, 120 S.Ct. at 691. The Court cited a law review article that gathered federal-circuit and state-court decisions that have taken different approaches to what is or is not a timely exercise of the right. John F. Decker, The Sixth Amendment Right to Shoot Oneself in the Foot: An Assessment of the Guarantee of Self-Representation Twenty Years After Faretta, 6 Seton Hall Constitutional Law Journal 483, 544-50 (1996). Some courts hold that a request is timely so long as it is made before the jury is empaneled. Chapman v. U.S., 553 F.2d 886, 894 (5th Cir. 1977); U.S. v. Bankoff, 613 F.3d 358, 373 (3d Cir. 2010) (collecting cases). On the other hand, the Supreme Court of Indiana, after weighing the interest of the defendant, the interest in preserving an orderly

criminal process, and other factors, held that the right "must be asserted within a reasonable time prior to the day on which the trial begins." Russell v. State, 383 N.E.2d 309, 314 (Ind. 1978). "Morning of trial requests are thus per se untimely." Id. Some courts reject such as per se rule and say "the timeliness of a Faretta motion made on the verge of trial must be determined by the facts of the individual case." Thomas v. Commonwealth, 539 S.E.2d 79, 83 (Va. 2000). In Faretta itself, the demand was made "weeks before trial." Faretta, 95 S.Ct. at 2541.

Petitioner's attack on the state court's ruling that his request was untimely might succeed if he were in the Fifth Circuit on direct appeal of a federal conviction, but this is a habeas review of a state court conviction that is subject to a different standard. "Under Section 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Harrington v. Richter, 131 S.Ct. 770, 786 (2011).

The Supreme Court acknowledged in Martinez that most (lower) courts have held that the right must be exercised timely, but it does not appear the Supreme Court itself has ever held what is or is not a timely exercise of the right. Lower courts have taken different positions on the issue. The approach taken by the state court in this case is at odds with the majority view of federal and state courts, but it is not inconsistent with the holding in any prior Supreme Court decision, so habeas relief is not permitted. See Thaler v. Haynes, 130 S.Ct. 1171, 1173 (2010) ("A legal principle is 'clearly established' within the meaning of

[Section 2254(d)] only when it is embodied in a holding of this Court.") and <u>Carey v. Musladin</u>, 127 S.Ct. 649 (2006) (lower courts diverged widely in their treatment of spectator-conduct claims, but no Supreme Court decision addressed the issue; grant of habeas relief vacated as inappropriate).

The state court's decision could also be supported on the grounds that the request for self-representation was not made "clearly and unequivocally" as was done in <u>Faretta</u> and other cases that have addressed the issue. Petitioner orally described his motion to Judge Bolin as one for self-representation "with co-counsel," and the written motion asked for appointment of standby counsel and that Petitioner be allowed to personally participate "at appropriate points in the trial." "<u>Faretta</u> does not require a trial judge to permit 'hybrid' representation" of this type. <u>McKaskle</u>, 104 S.Ct. at 953. Requesting such hybrid representation does not amount to a clear and unequivocal invocation of the right to self-representation. <u>U.S. v. Whitman</u>, 2001 WL 360789 (5th Cir. 2001) (affirming a federal conviction in the face of a similar request for hybrid representation); <u>U.S. v. Dulaney</u>, 48 Fed. Appx. 66 (4th Cir. 2002) (defendant's request to represent himself with technical assistance from appointed counsel was not a clear and unequivocal request for self-representation); and <u>U.S. v. Cano</u>, 519 F.3d 512, 516 (5th Cir. 2008) ("<u>Cano</u> sought to engage in hybrid representation whereby he and his attorney would act as co-counsel. There is no constitutional right to such form of representation ... .").

**Ineffective Assistance of Counsel**

Petitioner launches a broad attack that his trial counsel failed to adequately prepare for trial, file motions, investigate, interview witnesses, obtain exculpatory evidence, or obtain a continuance. Petitioner contends his attorneys should have done more with the witnesses Petitioner identified. He submits an affidavit from witness Gertrude Lee, who states that Ronnie Lee wrote her, admitted he committed the crime, and said that he would "free" Petitioner. Petitioner also submits an affidavit from Kerry Finkley, who says he was with Petitioner from 10:00 a.m. October 31 through 3:00 a.m. on November 1. He testifies:

> We were heavily under the influence of marijuana and alcohol. I also can verify that Quincy Lee never committed a crime while I was with him on the said dates and if he entered anyone's home during that time, than it was through strictly consent of the temporarily occupant of the home upon entering.

Petitioner first raised these arguments on direct appeal. The state appellate court summarized the arguments and set forth the applicable standard. To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

The state appellate court held that a review of the record did not show that trial counsel's representation fell below the standard of reasonableness and competency required of attorneys in criminal cases. It dismissed Petitioner's "broad statement" that counsel had insufficient time to prepare because such was not evidenced by the record. The court noted that defense witnesses were subpoenaed and did testify, including Gertrude and Ronnie Lee.

As for not calling other witnesses, the court said there was nothing to show that counsel erred in his "tactical decision not to bring the witnesses listed by the defendant" before the jury. State v. Lee, 909 So.2d at 681-83. Petitioner asserted the argument again in his post-conviction application. It was denied, with reference to the direct appeal decision.

Petitioner's claim was adjudicated and denied on the merits by the state court, so the question here is not whether a federal court believes the state court's determination under the Strickland standard was merely incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007). And, because the Strickland standard is a general one, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." Harrington, 131 S.Ct. at 786. Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

Petitioner claims in his memorandum to this court "that he never met the counsels who represented him at trial until the morning of trial." However, Petitioner wrote on the same page: "On January 7, 2004, Mr. Hillman visited the petitioner at Caddo Correctional Center to inform the petitioner that he had been appointed to represent him and notify the petitioner that the case was called for trial on January 12, 2004." Petitioner also admitted in open court

that Hillman visited him in jail three times before the trial. Tr. 93L-M. Petitioner complains a great deal about the short time Hillman was appointed to the case before trial, but it is not as if the other member of the IDB who earlier represented Petitioner did not leave a file with the results of his months of assignment to the case. A habeas petitioner who alleges a failure to investigate on the part of his counsel "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." Gregory v. Thaler, 601 F.3d 347, 352 (5th Cir. 2010). Petitioner's claims of lack of preparation are not supported by the record, and he identifies no specific lines of investigation that should have been pursued and would have altered the verdict.

Petitioner also complains that his counsel did not call or properly use witnesses. To prevail this claim, Petitioner must name the witness, demonstrate that the witness would have testified, set out the contents of the proposed testimony, and show that the testimony would have been favorable. Gregory, 601 F.3d at 352. Gertrude Lee was called as a witness, as Petitioner desired, and she seriously undermined Petitioner's claim that he was not familiar with the location of the crime. Ronnie Lee also testified, but he did nothing for the defense. Counsel is not at fault if witnesses his client insists on calling do not give the testimony the defendant wants to hear. The "Kerry" who submits the affidavit is presumably the person identified as "Carrie" in the transcript. Petitioner was asked at trial why Carrie was not there to testify. Petitioner said Carrie had moved to Oklahoma, and the reasons Carrie was not at trial was because Ronnie Lee had admitted to the crime and Petitioner did not know he was going to trial. Tr. 289-90. What Kerry offers in his affidavit is the same story testified to by

Petitioner and his brother. There is little reason to believe the jury would have bought Petitioner's version of the facts if only one more witness – especially one who admits he was "heavily under the influence of marijuana and alcohol" at the time – had been called to the stand.

A Strickland claim asserted on habeas must be adjudicated under Section 2254(d)(1), and the petitioner must overcome the limitations of that statutory standard "on the record that was before the state court." Cullen v. Pinholster, 131 S.Ct. 1388 (2011). It is reversible error for a district court to hold a federal hearing to flesh out such a claim. Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011). Petitioner cannot come close to meeting his burden on the state court record, so this claim should be rejected.

**Habitual Offender Status**

The State charged Petitioner as an habitual offender, and a hearing was held at which the State established that Petitioner was a third offender. Tr. 363-95. This led to the imposition of a life sentence. Tr. 398-405. One of the prior convictions was simple burglary, which was based on a guilty plea entered after Petitioner had been charged with two counts of simple burglary of an inhabited dwelling. Petitioner argued in his post-conviction application that Louisiana criminal procedure required the prosecutor to file an amended bill of information before the court could accept the plea, because simple burglary was not a lesser and included offense of the charged crime.

The district attorney did not include in the state court record the post-conviction proceedings. Fortunately, copies of the relevant documents are attached to Petitioner's

petition. Judge Bolin denied the application based on a Supreme Court of Louisiana decision that a trial judge does not lack jurisdiction to accept a guilty plea simply because the plea is not responsive to what was charged in the bill of information. The state appellate court held that the "trial court properly denied the claim of an invalid plea on a predicate offense," and the Supreme Court of Louisiana denied writs without comment.

Petitioner continues his argument that the prior plea violated the requirements of Louisiana procedural law. Even if Petitioner is correct, "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 112 S.Ct. 475, 479-80 (1981). Petitioner's argument is also foreclosed by Lackawanna County District Attorney v. Coss, 121 S.Ct. 1567 (2001). That decision holds that habeas relief is unavailable to a state prisoner when the prisoner challenges a current sentence on the ground that it was enhanced based on an allegedly unconstitutional prior conviction for which the prisoner is no longer in custody. There is an exception if counsel was not appointed in connection with a prior conviction, but Petitioner does not contend that he was without counsel when he pleaded guilty to the simple burglary charge, and the minutes attached to his petition reflect that he was represented by attorney Lane Pittard at the guilty plea and sentencing. No habeas relief is available on this claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 28th day of September, 2011.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE